**Richard L. ZALDIVAR, Cornelia S. Crossman, Esperanza Rodriguez, Ruth Swiggett, Yokio Kaneda, and Antonia Flores, Plaintiffs,**

v.

**CITY OF LOS ANGELES; Elias Martinez, as City Clerk of the City of Los Angeles, Defendants,**

**Margaret Salazar, Armando R. Acosta, Angela Baray; Charlotte Rae Burrell; and Richard Hodgin, Intervenors.**

**No. CV 84–1238–DWW (Gx).**

United States District Court, C.D. California.

July 10, 1984.

Iverson, Yoakum, Papiano & Hatch, Los Angeles, Cal., for plaintiffs.

Fredric D. Woocher, Ethan P. Schulman Center for Law in the Public Interest, John E. Huerta, Mexican American Legal Defense and Educational Funds, Inc., Kenneth Cirlin, Deputy City Atty., Los Angeles, Cal., for defendants.

## ORDER GRANTING INTERVENORS' MOTIONS FOR DISMISSAL and SANCTIONS

DAVID W. WILLIAMS, Senior District Judge.

Arthur K. Snyder was elected Councilman of the 14th Council District of the City of Los Angeles on April 12, 1983. Shortly after his election, supporters of the candidate he defeated, Steve Rodriguez, initiated a campaign to have Snyder recalled. On December 2, 1983, the recall proponents served on Snyder, and had published in the Los Angeles Daily Journal, a notice of intention to recall Snyder and the reasons for the proposed recall. In accordance with the requirements of the City Election Code in effect at the time, the notice and accompanying statement were published and printed in English only. On December 16, 1983, Snyder published his answer to the recall statement in the Los Angeles Herald Examiner in both English and Spanish.

On December 23, 1983, the recall proponents began circulating petitions and gathering signatures. On that date, however, the Los Angeles City Council unanimously passed Ordinance No. 158584, effective December 27, 1983, which provided that all recall materials must be published in both English and Spanish. The recall proponents then reprinted their petitions in English and Spanish and continued their efforts to get signatures for the recall. The petitions were tendered to the City Clerk on February 8, 1984, but were refused because the new ordinance required both the petition and the initial notice to be printed in English and Spanish. The recall proponents then initiated an action in the Superior Court of Los Angeles County to compel the City Clerk to accept the petitions for filing and determine whether there were sufficient signatures for a recall election to be held. The Superior Court found in favor of the recall proponents but the City of Los Angeles filed a notice of appeal thus staying the Superior Court's ruling. As a re-

sult, the City Clerk stopped processing the recall petition. The recall proponents proceeded to file an emergency application for an Order from the Court of Appeal dissolving the automatic stay of the Superior Court's ruling pending appeal. The Court of Appeal dissolved the stay and directed the City to comply with the Superior Court's ruling. After many delays, the signatures were counted and the clerk determined there were sufficient signatures for a recall election to be held. The election is presently scheduled for August 21, 1984.

*Proceedings in this Court.*

Plaintiffs, supporters of Snyder, filed a complaint alleging the proponents of .the recall election violated the Voting Rights Act, 42 U.S.C. § 1973aa–1a(b), (c), by publishing the notice of intention to recall in English only and sought to prevent the clerk from processing the petitions. Plaintiffs sought a temporary restraining order (TRO) and the defendants did not oppose the motion. The Court denied the motion and the recall proponents intervened in the action. A hearing on the issuance of a preliminary injunction enjoining the Clerk from counting the signatures on the petition was set for March 19th and the Court issued an Order the next day denying the motion. On April 2, 1984, Intervenors filed a motion to dismiss the first amended complaint. The motion was noticed for a hearing on May 7th but the parties stipulated to continue the hearing till May 21st. The stipulation provided that plaintiffs were to file opposition by April 23rd. Instead of filing opposition papers, plaintiffs filed a notice of dismissal pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure. Intervenors challenged the propriety of the dismissal and the Court vacated the notice of dismissal because it was untimely. Thus, the case was again live and plaintiffs were given the choice of either responding to the Intervenors' motion to dismiss, or seeking a Court dismissal pursuant to Rule 41(a)(2). Plaintiffs chose the former. There is a motion to dismiss before the Court, and the Intervenors also move for an award of attorney's fees and costs as sanctions for plaintiffs' bringing this lawsuit.

II.

A. *Motion to Dismiss.*

In order to decide this motion to dismiss, the Court will have to look to material outside the pleadings. When the Court does this, the motion to dismiss must be treated as one for summary judgment. *Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan,* 662 F.2d 641, 645 (9th Cir.1981). Accordingly, this motion will be treated as one for summary judgment.

When a Rule 12(b)(6) motion is converted to a summary judgment motion, the general rule is that the nonmoving party must be given notice and a reasonable opportunity to contest the motion. *Id.* No notice is necessary in this case because the plaintiffs are aware the motion to dismiss would be treated as one for summary judgment; it was on this basis the notice of dismissal pursuant to Rule 41(a)(1) was deemed untimely and thus vacated. Intervenors, then, are entitled to summary judgment if the record before the Court reveals the absence of any material issue of fact and the Intervenors are entitled to judgment as a matter of law. *See id.* There are no material issues of fact that require trial and the Intervenors are entitled to judgment as a matter of law.

(1) *Violation of the Voting Rights Act.*

Plaintiffs contend the proponents of the recall election (Intervenors) violated the Voting Rights Act by publishing the notice of intention to recall in English only. Specifically, plaintiffs contend 42 U.S.C. § 1973aa–1(b) which provides that

no State or political subdivision shall provide registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, including ballots, only in the English language if the Director of the Census determines (i) that more than 5 percent of the citizens of voting age of

such State or political subdivision are members of a single language minority and (ii) that the illiteracy rate of such persons as a group is higher than the national illiteracy rate...., and (c), which provides further, that any registration or voting notices, forms, instructions, assistance, or other materials or information pertaining to the electoral process shall be in the language of that minority group as well as in English. The language of the relevant minority group in the 14th District is Spanish and the Court must determine whether the sections of the Voting Rights Act referred to above were violated by the publication of a Notice of Intention to Recall in English only. There appears to have been no violation.

The statute provides that "no State or political subdivision" shall distribute election related materials in English only when more than five percent of the citizens of voting age are members of a single language minority. There is no dispute that Snyder's District constitutes a "political subdivision." In this case, however, the District as an entity was not involved in the recall attempt. Rather, private citizens were solely responsible for the successful attempt at getting Snyder's name placed on a ballot for recall. The Voting Rights Act cannot be properly construed as applying to such situations. The Act clearly requires State action before its requirements can be imposed and plaintiffs have not established a link between the proponents of the recall campaign and the District.

Furthermore, the language of the statute indicates that it applies to information relating to the electoral process. Plaintiffs contend that the recall petition process should be considered part of the electoral process. Such a position requires a rather distorted view of the electoral process because nothing one would associate with an election occurs at that stage; principally, no voting occurs. Plaintiffs' principal challenge is directed at the publication of the notice of intention to recall in English only. The Court cannot reasonably conclude that such conduct violates the Act when it is merely the first step in a process which might ultimately lead to the holding of an election to recall an elected official. Now that an election has been scheduled, the terms of the statute are applicable because its legislative history indicates Congress was concerned about impediments to a citizen's ability to exercise his right to vote. Spanish speaking citizens cannot be considered to have been deprived of their right to vote by the publication of a notice of intent to recall in English only. *See Gerena-Valentin v. Koch,* 523 F.Supp. 176 (S.D. N.Y.1981).

Plaintiffs also argue that a notice of intention to recall should be considered a prerequisite to voting. That is stretching things a bit far. Plaintiffs refer to 42 U.S.C. § 1973*l* (c)(1) which defines "vote" or "voting" as "all action necessary to make a vote effective in any primary, special, or general election including ... [any] action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate total of votes cast ...." This argument suffers from the same defect as the one raised above. That is, there is no voting until there are sufficient signatures on the petition for recall so that an election can be held. Additionally, nowhere is it shown that a voter must publish a notice of intent to recall, or any notice at all, before he can vote. The argument is fundamentally unsound.

*Summary.*

The Intervenors are entitled to summary judgment on the first amended complaint because as a matter of law, they did not violate the Voting Rights Act by publishing a notice of intent to recall in English only.

### B. *Motion for Award of Attorney's Fees and Costs as Sanctions.*

Intervenors seek sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure for the bringing of this lawsuit. They request sanctions in the form of attorney's fees and costs incurred in defending this action.

### 1. Sanctions Under Rule 11.

Rule 11 states in pertinent part that (1) every motion or other pleading must be "well grounded in fact" to the best of the attorney's knowledge, information, or belief formed after reasonable inquiry; (2) the claim or motion must be warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law;" and (3) it must not be interposed for "any improper purpose," such as harassment, delay, or needless increase in the cost of litigation. Plaintiffs argue that the Court must find subjective bad faith on their part or on counsel's part, in order to award sanctions for the filing of this lawsuit. They rely on *Badillo v. Central Steel & Wire Co.*, 717 F.2d 1160 (7th Cir. 1983) to support their argument.

A careful reading of that case indicates that it does not support plaintiffs' argument. Judge Campbell, writing for the Court in *Badillo*, found subjective bad faith to be the "proper" test in determining whether to award fees and costs against counsel under Rule 11. The Rule 11 the Court referred to was the Rule as it existed before it was amended in April, 1983. Much of the *Badillo* Court's discussion of the propriety of sanctions under Rule 11 centered on whether attorney's fees and costs could form any sanctions imposed by a Court. The Court noted that 'nowhere [does Rule 11] explicitly provide[ ] for an award of attorneys' fees." 717 F.2d at 1166. Had the Court been dealing with Rule 11 in its amended form the Court would not have made this statement, or grappled with the issue of the propriety of attorney's fees as sanctions, because Rule 11 as amended states: "an appropriate sanction ... may include ... a reasonable attorney's fee." In addition, the Court apparently based its finding of subjective bad faith on the provision in the then existing Rule that a violation must be "willful" before an attorney may be subjected to sanctions. The willfulness requirement was deleted when Rule 11 was amended. It seems clear, then, that *Badillo* is of no force and effect.

A subjective bad faith finding would be difficult to make and thus makes it more difficult for courts to impose sanctions for Rule 11 violations. Furthermore, bad faith is not necessarily a prerequisite to the filing of a lawsuit which has no basis in law or fact. Attorneys may well file suits without first considering the plausibility of the claim. Such conduct may not be in bad faith, but it should not be condoned.[1] The purpose of sanctions is to "discourage dilatory or abusive tactics and help to streamline the litigation process by lessening frivolous claims or defenses." Fed.R.Civ.P. 11 advisory committee note. A subjective bad faith requirement would not fully serve that purpose. Although the Advisory Committee Note to Rule 11 states that the amended Rule "[builds upon and expands] the equitable doctrine permitting the court to award expenses, including attorney's fees, to a litigant whose opponent acts in bad faith in instituting or conducting litigation," the tenor of the Note and the deletion of willfulness as a prerequisite to sanctions, indicates that the courts are not to be constrained by a subjective bad faith requirement.

Thus, this Court adopts a less rigid standard in determining whether sanctions under Rule 11 are appropriate; that is, whether the plaintiff's action was so without factual and legal foundation that it can be considered frivolous or unreasonable.[2] *Cf. Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978) (district court has discretion to award attorney's fees to a prevailing defendant in Title VII case upon finding that plaintiff's action was frivolous,

---

**1.** The Advisory Committee Note to Rule 11 states that the Rule places an affirmative duty on the attorney to make a reasonable inquiry into the legal and factual basis for the lawsuit. Implicit in that admonition is that negligent conduct is not to be condoned.

**2.** Of course, a finding of subjective bad faith makes sanctions appropriate. This Court has merely defined the type of conduct which at a minimum should make sanctions under Rule 11 appropriate.

unreasonable, or without foundation). The Court believes that such a standard better furthers the purpose of Rule 11. As noted above, the aim is to lessen the filing of frivolous claims or defenses, and Rule 11 itself requires that the pleading be well grounded in fact and law. Thus, the test proposed by this Court satisfies the express requirements for imposing sanctions under Rule 11 and at the same time furthers the goal of lessening the filing of frivolous claims by making it easier for courts to impose sanctions in appropriate circumstances. The issue to be resolved then, is whether the test has been satisfied in this case, thus warranting sanctions. The court finds this case to be appropriate for imposing sanctions.

■ Plaintiffs' arguments are so without merit that their claim can be deemed frivolous. The statutes upon which they base their claim clearly do not provide support. A cursory reading of the statutes would indicate to a reasonable person that there is no basis for bringing this lawsuit. Plaintiffs argue that the suit was brought in good faith and that the issues raised in their pleadings are novel. This Court has already dismissed any subjective bad faith requirement and a claim does not rise to the level of being novel when it clearly has no legal support. In fact, such a claim can be considered to have been brought in bad faith. *See Browning Debenture Holders' Comm. v. Dasa Corp.,* 560 F.2d 1078, 1088 (2d Cir.1977). Rule 11 proscribes the filing of claims such as the one before this Court even though not brought in subjective bad faith. Counsel should not file actions not well founded in fact and law because the end result is the burdening of an already crowded docket and the incurring of unnecessary legal expenses for the parties involved. The best means of ensuring this is to impose sanctions. Accordingly, sanctions in the form of attorney's fees and costs will be awarded to the Intervenors in this case.

The Advisory Committee Note to Rule 11 states that where the circumstances are appropriate, the court may impose a sanction on the client as well as the attorney. Implicit in that provision is that both parties may share the burden of satisfying the sanction. The circumstances attendant to this case indicate that both counsel and their clients should share the burden of paying Intervenors' attorney's fees and costs. It is reasonable to conclude that plaintiffs were aware of the legal defects in the claim filed in their behalf. The same claim was raised in state court and it was dismissed. In addition, plaintiffs appear to be ready and willing parties in an effort to stall the recall petition process initiated by Intervenors. Every attempt in state court to derail the recall process failed and plaintiffs made a last ditch effort in this court. The Court cannot allow the judicial system to be used for such purposes when there is neither a factual nor legal basis for the claim. Plaintiffs, therefore, will share the burden of paying the Intervenors' fees and costs. The only remaining issue is the amount of the fees and costs.

### 2. *The Amount of Fees and Costs.*

Counsel for the Intervenors have filed affidavits in support of a fee award amounting to $16,991.25 and costs amounting to $277.52. The Court will address only the fee award and counsel are to file their request for costs with the Clerk's office. The factors a court is to consider when determining the amount of attorney's fees to award a party were enunciated in *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67 (9th Cir.1975), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976). The factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to performing the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the profes-

sional relationship with the client; and (12) awards in similar cases. These factors have been deemed redundant and imprecise and thus are not rigidly applied. *See Copeland v. Marshall,* 641 F.2d 880, 890 (D.C. Cir.1980) (en banc). Instead, several courts have employed an alternate approach to calculating fee awards termed "lodestar." This entails the calculation of a "lodestar" figure determined by multiplying the number of hours reasonably expended by counsel and the reasonable hourly rate prevailing in the community for comparable legal services. Once the lodestar figure is determined, the fee applicant may request an adjustment of the lodestar. *See National Ass'n of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1328 (D.C.Cir. 1983) (per curiam). Counsel for the Intervenors do not seek a multiplier in this case.

The Ninth Circuit "has yet to directly approve the use of straight lodestar analysis." *Moore v. Jas. H. Matthews & Co.,* 682 F.2d 830, 840 (9th Cir.1982). Rather, the Circuit has approved of an approach combining the best features of both the lodestar analysis and the factors enunciated in *Kerr v. Screen Extras Guild, supra. Id.* Under this standard, the initial step in fixing an award of attorney's fees is to determine the number of hours reasonably expended by counsel, then multiply those hours by a reasonable hourly rate. Once this task is done, the Court may consider factors such as whether the case was taken on a contingency basis, and the extent of success achieved by the attorney, in deciding whether to adjust the lodestar figure up or down. *White v. City of Richmond,* 559 F.Supp. 127 (N.D.Cal.1982), *aff'd,* 713 F.2d 458 (9th Cir.1983). This Court will not consider an adjustment of the lodestar figure arrived at in this case because Intervenors seek no adjustment. In any event, this case is not one where such an adjustment would be appropriate because upward adjustments are reserved for cases where exceptional results are achieved. *See Elser v. I.A.M. Nat'l Pension Fund,* 579 F.Supp. 1375, 1380–81 (C.D.Cal.1984). This is not such a case. The Court will now proceed to determine the lodestar figure.

(a) *hours reasonably expended.*

■ The fee applicant must submit detailed information on hours logged and work done. *White v. City of Richmond,* 713 F.2d at 461; *Elser v. I.A.M. Nat'l Pension Fund,* 579 F.Supp. at 1378. The applicant is entitled only to an award which reflects time reasonably expended and the Court must exclude hours that are excessive, redundant, or otherwise unnecessary. *See Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983). Intervenors' counsel have submitted a memorandum which details the nature of the work done during this litigation and the amount of time spent. Mr. Woocher, the principal attorney in the case claims 96.75 hours, and his associate, Mr. Schulman, claims 71.75 hours. The Court has reviewed the papers and finds that 10.75 hours should be deducted from Mr. Woocher's hours claimed, and 10 hours should be deducted from Mr. Schulman's hours claimed. Specifically, Mr. Woocher and Mr. Schulman claimed hours worked before they became involved in this lawsuit, as well as time spent with the press and time spent compiling the hours they worked. Such time cannot be passed on to the party who has to pay the fees because those hours were not spent on work related to this litigation. Accordingly, Mr. Woocher's hours are adjusted down to 86 and Mr. Schulman's are adjusted down to 61.75.

(b) *reasonable hourly rate.*

■ The fee applicant generally must provide specific evidence of the prevailing rate in the community for the type of work he seeks an award. *Elser,* 579 F.Supp. at 1378. This usually entails the submission of affidavits reciting the fees similarly qualified attorneys have received from fee-paying clients in comparable cases. *Id.* The Court can also consider awards in similar cases. *National Ass'n of Concerned Veterans,* 675 F.2d at 1325; *Elser,* 579 F.Supp. at 1380. Mr. Woocher requests an hourly rate of $120 and Mr. Schulman requests an hourly rate of $75.00. Both at-

torneys work for the Center for Law in the Public Interest and thus do not charge clients a fee for work done. The Center depends on court awarded fees for its survival and counsel have submitted information on the hourly rates on which past fee awards to the Center have been based. The Court has reviewed this information and finds that the rates requested by Woocher and Schulman are more than reasonable. In addition, the Court has considered the factors enunciated in *Kerr v. Screen Extras Guild, supra,* and finds that a lower award is not warranted.

(c) *the lodestar figure.*

■ The lodestar figure for Mr. Woocher is 86 (hours reasonably worked) × 120 (reasonable hourly rate) which is $10,-320.00. The lodestar figure for Mr. Schulman is 61.75 × 75 which is $4,631.25. In sum, the total fee award is $14,951.25.

IT IS SO ORDERED.