**Rita MONTERO, Delfina Maria Garcia, Francisco Coca and Apolinar Rael, Plaintiffs,**

v.

**Natalie MEYER, Secretary of State of the State of Colorado; State of Colorado; Official English Committee; Barbara Murray Philips; Mary Ann Carlos; Thaddeus F. Gembczynski: Chong Cha Woodfill; and Violette Mehle Cordova, Defendants.**

**Civ. A. No. 88–C–889.**

United States District Court, D. Colorado.

Sept. 16, 1988.

MEMORANDUM OPINION
AND ORDER

CARRIGAN, District Judge.

This case arises out of the efforts by certain of the defendants to add an amendment to the Colorado Constitution designating English as the official language of the State of Colorado. Plaintiffs Rita Montero, Delfina Maria Garcia, Francisco Coca, and Apolinar Rael are Hispanic citizens of, and qualified voters in, the State of Colorado. They commenced this declaratory relief action pursuant to the Voting Rights Act of 1965, as amended, 42 U.S.C. §§ 1973, *et seq.,* and 42 U.S.C. § 1983. Defendants are Colorado Secretary of State Natalie Meyer, the State of Colorado, the Official English Committee, Barbara Murray Philips; Mary Ann Carlos; Thadeus F. Gembczynski, Chong Cha Woodfill, and Violette Mehle Cordova. Jurisdiction is alleged to exist pursuant to 28 U.S.C. §§ 1331, 1343 and 2201, *et seq.,* and 42 U.S.C. § 1973.

Currently pending is the plaintiff's motion for a preliminary injunction. An all day hearing was held on this motion on September 15, 1988. Additionally the parties have submitted briefs in support of their legal arguments. Most of the facts are uncontested. For the limited purpose of ruling on the motion for preliminary injunction, I make the following findings of fact and conclusions of law:

## I. BACKGROUND.

In 1987, the defendant Philips, an elected state representative in the Colorado General Assembly, introduced House Bill 1038 which, if enacted, would have made English the official language of the State of Colorado. The bill did not receive enough support to be reported out for a vote of the house and died at the end of the session.

Subsequently, the defendants Representative Philips and the English Only Committee commenced proceedings to submit the "English Only" proposal as a proposed state constitutional amendment through the initiative procedure. At this point a

Kenneth A. Padilla, Barry D. Roseman, Henry J. Feldman, Denver, Colo., for plaintiffs.

Catharyn A. Baird, Office of Secretary of State, Denver, Colo., for defendants Meyer, State.

Richard J. Spelts, Denver, Colo., James K. Kreutz, Englewood, Colo., for non-governmental defendants.

brief overview of Colorado procedure regarding ballot initiatives would be helpful.

Any person wishing to place a proposed state constitutional amendment on the ballot in the State of Colorado must take the following steps:

(a) The proponents of the proposed constitutional amendment must submit a draft of the proposal to the Colorado Legislative Council and the Colorado legislative Drafting Office. Colo.Rev.Stat. § 1–40–101(1). Those state agencies review and prepare comments concerning the language of the proposed amendment and present those comments to the proponents. Next, the proponents must submit the proposed amendment to the Colorado Secretary of State.

(b) The Secretary of State's office schedules a public hearing before the Secretary of State, the Colorado Attorney General, and the Director of the Colorado Legislative Drafting Office. Colo.Rev. Stat. § 1–40–101(2). The hearing must be held on the first or third Wednesday of the month on which the draft of the proposed amendment has been submitted to the Secretary of State's office.

(c) At the public hearing, the three officials named above meet as a "Title Board." This board has the statutory authority and duty to draft the ballot title and submission clause for the initiative, and to prepare a summary of its content. This information must be included in the printed petition forms, along with the language of the proposed constitutional amendment. The summary includes a statement concerning the fiscal impact of the amendment if enacted by the voters. If the proponents obtain sufficient signatures on the petitions and meet the other requirements for placing the measure on the ballot, the ballot title and submission clause are presented to the voters at the next general election on printed ballots and in voting machines.

(d) Any proponent of the proposed constitutional amendment dissatisfied with any of the title board's decisions may move for a rehearing within 48 hours of the board's decision. Colo.Rev.Stat.

§ 1–40–101(3). The title board's decision on the motion for rehearing is certified automatically to the Colorado Supreme Court for an expedited appeal.

(e) If any other registed elector is dissatisfied with the decision of the title board, he or she has 30 days to move for rehearing. Colo.Rev.Stat. § 1–40–102(3). The title board's decision on such a motion for rehearing is certified automatically to the Colorado Supreme Court for judicial review in the same manner and on the same timetable as a proponent's motion for rehearing.

(f) The initiative's proponents may circulate petitions containing the information approved by the title board. The petitions must contain certain warnings and other information specified by statute. Colo.Rev.Stat. § 1–40–107. The statute requires that the warnings be in red boldface type of a specified point size. The pages containing the proposed amendment's language, title, ballot title, submission clause, summary, and petition signature lines each must contain the statutory warning language.

(g) After collecting signatures, the proponents of the proposed constitutional amendment, if they wish to continue their effort, must submit the completed petition forms to the Secretary of State who is required to determine if they contain at least the statutorily mandated number of valid signatures by registered electors. Colo.Rev.Stat. § 1–40–109.

(h) If the Colorado Secretary of State's office certifies that the proponents have complied with the statutory requirements for submission of signatures, any registered elector may file a written protest of that decision. Colo.Rev.Stat. § 1–40–109. If a protest is filed, the Secretary of State must hold a hearing limited by statute to the issue whether the proponents have met the minimum signature requirements. Judicial review of the Secretary of State's decision is available under Rule 106(a)(4), Colo.R. Civ.P. That judicial review is limited to determining whether the Secretary of State acted arbitrarily, capriciously, or in

excess of her constitutional or statutory authority in reaching her decision.

In the spring of 1987, the defendant Philips, submitted the English Only Committee's proposed constitutional amendment to the Colorado Legislative Council and Colorado Legislative Drafting Office, pursuant to Colo.Rev.Stat. § 1–40–101(1). On April 24, 1987, the staffs of those two agencies prepared a three-page written report, setting forth their proposals and comments concerning the wording of this proposed constitutional amendment. Defendant Philips met with those staff members on April 27, 1987 to discuss their comments and proposals.

On April 29, 1987, the defendant English Only Committee formally submitted the proposed constitutional amendment to the defendant Secretary of State Meyer. The proposed amendment incorporated changes, and added two provisions as a result of the defendant Philips' meeting with staff members of the Colorado Legislative Council and the Colorado Legislative Office, both state agencies.

The following day, the defendant Meyer issued a written notice of a title board hearing to consider the proposed constitutional amendment. The notice provided that the hearing would be held on May 6, 1987, at 2 p.m. The notice was printed in the English language only. Copies of the notice were mailed only to proponents of the proposed ballot initiative. In addition, an undetermined number of copies of the notice were placed in the Colorado State Capitol Building at the third floor press area and outside the former first floor office of the Colorado Secretary of State. Neither Meyer nor the State of Colorado provided any other written notice of the upcoming title board hearing.

On May 6, 1987, the title board held a public hearing on the English Only amendment's title, the ballot's title, and the amendment's submission clause. Additionally, the board prepared a summary of the ballot initiative. The language drafted by the title board at the public hearing subsequently was printed on the petitions circulated by the defendant English Only Committee.

At the title board hearing, the defendant Meyer informed those persons present of their right to file a motion for rehearing of the title board's decisions, and of the time deadlines for filing such a motion. Defendant Meyer provided the same information to the defendant Philips in a letter dated May 7, 1987. Neither Meyer nor the defendant State of Colorado provided other written notice of the right of any other person to move for a rehearing of the title board's decisions.

Defendant English Only Committee submitted the printed petition forms to the defendant Meyer for approval. In a letter dated May 15, 1987, Donetta Davidson, an elections officer employed in the Colorado Secretary of State's Office, approved the petition forms, with certain corrections.

Defendant Official English Committee then circulated the petitions, which were printed in the English language only. In addition to several other counties, the petitions were circulated in the following counties that are subject to the bilingual requirements of the Voting Rights Act of 1965, as amended, 42 U.S.C. §§ 1973b(f)(4) and 1973aa–1a(c): Alamosa, Archuleta, Bent, Conejos, Costilla, El Paso, Huerfano, Las Animas, Otero, Pueblo, Rio Grande, and Saguache (collectively referred to as the "bilingual counties").

On October 29, 1987, the defendant English Only Committee submitted signed and notarized petition forms to the defendant Meyer. On November 13, 1987, Meyer verified that the petitions contained at least 50,668 valid signatures, sufficient to satisfy the statutory requirement for the submission of an initiated constitutional amendment to the voters of Colorado.

Defendant Meyer also issued a public notice, stating that any elector registered in Colorado could file a protest concerning the English Only ballot initiative on or before November 27, 1987. On November 27, 1987, the plaintiff Montero filed a verified protest to the ballot initiative. In her protest, she asserted that the petitions circulated by the defendants did not comply

with the Voting Rights Act, thereby rendering the initiative invalid. She also alleged that the language used in the initiative and required fiscal impact statement was vague.[1]

On December 15, 1987, Meyer held a hearing on Montero's protest. However, at the hearing Meyer refused to hear any evidence or arguments from the plaintiff Montero regarding alleged violations of the Voting Rights Act or purported deprivation of Montero's right to due process resulting from the lack of notice provided to her and other persons similarly situated. Defendant Meyer concluded that Montero should have raised these issues either at the title board hearing, or in a motion for rehearing filed within 20 days of that hearing. Meyer further concluded that Montero, in her post-circulation protest, could raise only the issue of the validity of the signatures appearing on the petitions. Defendant Meyer then dismissed Montero's protest.

Plaintiff Montero testified that she did not appear at the title board hearing or file a motion for rehearing within 30 days of the date of that hearing because she did not know that the hearing would occur or had occurred. She further testified that had she received notice of the title board hearing, that she would have attended the hearing.

Following dismissal of her protest, the plaintiff Montero filed a civil action in state district court under Rule 106(a)(4), Colo.R. Civ.P. In that action, she claimed that the defendant Meyer had acted arbitrarily and capriciously in not permitting her to present evidence on the issues raised in her verified protest. The state court dismissed Montero's complaint, concluding that Meyer had acted properly in limiting the issues that could be raised in the protest hearing to the question of the validity of the signatures on the petitions. The state court also held that it lacked jurisdiction to consider Montero's claim under the Voting Rights Act.

Plaintiffs then commenced this action for injunctive and declaratory relief. On July 1, 1988, the defendants Meyer and the State of Colorado filed a motion to dismiss for failure to state a claim upon which relief may be granted. On July 29, 1988, the Official English defendants submitted a motion to dismiss, adopting the legal arguments of Meyer and the State of Colorado.

On August 12, 1988, the plaintiffs filed a motion to amend their complaint. By order dated August 15, 1988, that motion was granted. The motions to dismiss subsequently were denied as moot.

The amended complaint contains two claims for relief. The first claim alleges that the defendants violated § 2(a) of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973(a), by employing a "standard, practice and/or procedure imposed and/or applied" in a manner that results in a denial or abridgement of the right of any citizen of the United States to vote and participate in the electoral process, in contravention of the guarantees set forth in 42 U.S.C. § 1973b(f)(2). (¶ 19) The first claim further asserts that the defendants violated 42 U.S.C. §§ 1973b(f)(4) and 1973aa–1a(c) by providing "material or information relating to the electoral process only in the English language." (¶ 20) Plaintiffs allege that more than 61,000 of the signatures obtained on the initiative petitions were invalid under the Voting Rights Act because of the defendants' failure to circulate petitions printed in both English and Spanish in the "bilingual counties." (¶ 21)

The second claim for relief asserts that the defendants Meyer and the State of Colorado violated the plaintiffs' due process rights under the Fourteenth Amendment by failing to provide them adequate notice of the title board hearing held on May 6, 1987.

On August 30, 1988, both groups of defendants filed motions to dismiss the amended complaint for failure to state a claim upon which relief may be granted.

---

**1.** Plaintiffs suggest that a potential infirmity with the actual amendment itself is its failure to define "official" as that term would be applied to the requirement of "English Only." Of course the term "English" suffers from its own ambiguity. Indeed, Professor Higgins in "My Fair Lady" opined that 'In America, English hasn't been used for years.'

Defendants contended that: (1) the first claim for relief must be dismissed because the Voting Rights Act does not apply to ballot initiative petitions; and (2) the second claim for relief must be dismissed because the May 6, 1987 title board hearing was quasi-legislative in nature, and, therefore, the plaintiffs were not entitled to notice of the hearing. By order dated September 16, 1988, I denied the defendants' motions to dismiss the amended complaint.

On August 19, 1988, the plaintiffs filed the motion for preliminary injunction now before this court. Plaintiffs seek to enjoin the defendants Meyer and State of Colorado from holding an election on the English Only issue because of the allegedly improper petitions and notice. According to counsel for the defendants Meyer and the State of Colorado, Meyer must certify the ballot for the November 8, 1988 election by September 19, 1988.

## II. REQUEST FOR PRELIMINARY INJUNCTION.

In order to obtain a preliminary injunction, the moving party must demonstrate that: (1) there is a substantial likelihood that the moving party eventually will prevail on the merits; (2) the moving party will suffer irreparable injury unless the injunction issues; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction, if issued, would not be adverse to the public interest. *Tri–State Generation v. Shoshone River Power, Inc.*, 805 F.2d 351 (10th Cir.1986); *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980).

### A. *Substantial Likelihood of Prevailing on the Merits.*

The purpose of the Voting Rights Act of 1965 is to promote practical implementation of the Fifteenth Amendment, and to ensure that no citizen's right to vote is denied or abridged on account of race. *NAACP v. New York*, 413 U.S. 345, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973). Citizens are entitled to seek a declaratory judgment that a state has failed to comply with the Act. *Allen v. State Board of Elections,*

393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). The Voting Rights Act should be construed broadly. *See id.* at 565, 89 S.Ct. at 831 ("We must reject a narrow construction that appellee would give § 5. The Voting Rights Act was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of race").

The Act was amended in 1976 to add minority language provisions to assure that non-English speaking electors were not denied access to the polls and the election process because of problems in understanding English. Section 1973b(f)(4), 42 U.S.C., provides, in relevant part:

"Whenever any State or political subdivision subject to the prohibitions of the second sentence of section 4(a) [subsec. (a) of this section] provides any registration or voting notices, forms, instructions, assistance, or *other materials or information relating to the electoral process,* including ballots, it shall provide them in the language of the applicable language minority group as well as in the English language." (Emphasis added.)

Practically identical language is contained in 42 U.S.C. § 1973aa–1a(c).

Defendants contend that neither § 1973b(f)(4) nor § 1973aa–1a(c) applies to petitions circulated for the purpose of placing a constitutional amendment on the ballot by initiative. This contention is contrary to one of the United States Justice Department's implementing regulations for the Voting Rights Act. Section 55.19(a), 28 C.F.R., provides, in pertinent part:

"A jurisdiction required to provide minority language materials is only required to publish in the language of the applicable language minority group materials distributed to or provided for the use of the electorate, generally. Such materials include, for example, ballots, sample ballots, informational materials, and *petitions.*" (Emphasis added.)

Defendants have not argued, nor submitted any authority to the effect that the term "petitions," as used in § 55.19(a), does not apply to ballot initiative petitions. At

oral argument they were unable to cite any reason or authority for not applying the regulation to the instant petitions. Indeed, I am unaware of any other type of petition likely to have been considered by the drafters of that section. Thus under § 55.19(a), it appears that the minority language provisions of the Voting Rights Act apply to initiative petitions.

Deference to the interpretation of the agency charged with enforcing the law is a familiar doctrine. Here the Justice Department's regulation is entitled to deference as the only available, authoritative interpretation, because no court has squarely addressed the issue whether the language minority provisions of the Voting Rights Act apply to initiative petitions. Indeed, it appears that only three published opinions by federal courts have dealt with the applicability of the Voting Rights Act's minority language provisions to either the initiative or the recall process. The first case was *Gerena–Valentin v. Koch*, 523 F.Supp. 176 (S.D.N.Y.1981). There a candidate for the New York City Council alleged that New York City had violated § 4(e) of the Voting Rights Act (relating to conditioning the right to vote upon an ability to read and understand the English language) by failing to provide bilingual aid in the ballot petition process. In rejecting the candidate's claim, the court reasoned that "there was no showing that the defendants failed to adequately provide bilingual assistance in the ballot petition process." *Id.* at 177. The court added that "the failure to provide bilingual petitions does not by itself deprive the Hispanic community of their right to vote, particularly where as here the plaintiffs have not made any effort on their own to provide the bilingual aid they now request." *Id.*

The *Gerena–Valentin* opinion does not recite the facts in detail, but based on the scant facts provided it appears that the case is distinguishable from the present action. For example, in contrast to the role played by Colorado state government in fashioning the initiative petition language in the present case, it does not appear that New York City played any part in establishing the form or contents of the petitions involved in that case. Moreover, while the plaintiffs asserted that the city failed to provide bilingual assistance in the ballot petition process, it was the plaintiffs themselves who were circulating the petitions. Thus the court there apparently concluded that it would be inappropriate to hold the defendants responsible for Voting Rights Act violations perpetrated by the plaintiffs.

The second and third decisions both arose out of a political squabble caused by a drive to recall a Los Angeles City Council member. In *Zaldivar v. City of Los Angeles*, 590 F.Supp. 852 (C.D.Cal.1984), supporters of the city council member sued the City of Los Angeles and the city clerk, alleging that the recall election violated the Voting Rights Act because the proponents of the recall effort had published a notice of the recall in a local newspaper in English only. The district court granted summary judgment in favor of the defendants on the grounds that (1) the recall petition process was not part of the electoral process; and (2) no state action was involved.

In determining that the recall petition process was not part of the electoral process, and, therefore, not covered by the Voting Rights Act, the district court reasoned:

> "Such a position requires a rather distorted view of the electoral process because nothing one would associate with an election occurs at that stage; principally, no voting occurs. Plaintiffs' principal challenge is directed at the publication of the notice of intention to recall in English only. The Court cannot reasonably conclude that such conduct violates the Act when it is merely the first step in a process which might ultimately lead to the holding of an election to recall an elected official." *Id.*

The court reasoned that no state action occurred because no state or political subdivision had been involved in publication of the notice. The court said:

> "[P]rivate citizens were solely responsible for the successful attempt at getting [the councilman's] name placed on a ballot for recall. The Voting Rights Act

cannot be properly construed as applying to such situations. The Act clearly requires State action before its requirements can be imposed and plaintiffs have not established a link between the proponents of the recall campaign and the District." *Id.* at 855.

The court then imposed sanctions against the plaintiffs pursuant to Rule 11, Fed.R. Civ.P.

Plaintiffs in *Zaldivar* appealed only the portion of the district court's judgment imposing sanctions against them. (The Voting Rights Act issue apparently was rendered moot by the council member's winning the recall election.) The Ninth Circuit reversed the imposition of sanctions, concluding that "a competent attorney, after reasonable inquiry, could argue in good faith that a notice of intention to recall an office holder provides information relating to the electoral process." *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 833 (9th Cir.1986). The court found "[t]he argument that a recall notice is only a preliminary step to voting and therefore is unaffected by the bilingual provisions of the Act" to be "without merit." *Id.* at 833 n. 11. The court also noted that the Voting Rights Act "does not exempt information or material, compelled by statute, which is preliminary to voting, but essential if an election is to occur." *Id.*

With respect to the district court's conclusion that no state action had occurred, the Ninth Circuit stated:

"The election itself is merely the culmination of [the recall] process. It includes those acts that a citizen must perform to establish his eligibility as a voter, as well as those acts that a candidate must perform to place his name on the ballot. The range of conduct 'relating to the electoral process' includes, for example, compliance by a would-be voter with statutes regulating registration and compliance with other statutes to place a name or an issue on the ballot. *That the state* or a political subdivision *has mandated by law that certain preliminary steps be taken by* the would-be voter, the candidate for office, or *the proponents of*

*an issue does not in any sense absolve the governmental entity of its responsibility under the Voting Rights Act.* Such compelled acts are far from removed from those voluntarily undertaken by a candidate, such as the printing of campaign literature." *Id.* (emphasis added).

I recognize that the Ninth Circuit in *Zaldivar* did not review the lower court's decision on the Voting Rights issue for legal error. Rather, it held only that the plaintiffs' argument under the Act was plainly not frivolous, as that term is used in Rule 11. Nevertheless, I find the reasoning of the Ninth Circuit in *Zaldivar* to be both applicable and persuasive here.

I agree with the Ninth Circuit's dictum that the Voting Rights Act does not exempt information or material which is compelled by statute and is therefore essential before an election can occur. Here, Colorado law requires the circulation of petitions prior to an election for an amendment by initiative to the Colorado Constitution. Thus it is an essential step in the electoral process.

Petitions for proposed ballot initiatives provide important information relating to the electoral process. Indeed the petitions are essential to the electoral process because they advise qualified electors of the contents of initiatives that may appear on the ballot in an election, stimulate public debate, and generate media coverage and editorial comment for and against proposed ballot initiatives. As observed by the plaintiffs, "[t]he mere fact that a proposed ballot initiative has or has not gathered sufficient signatures to meet the requirements established by law often becomes an important fact, in and of itself, in public debate and discussion." (Amended complaint ¶ 18.)

■] The Voting Rights Act itself contains the following statement, revealing the Congressional intent and purpose in creating it:

"[V]oting discrimination against citizens of language minorities is pervasive and national in scope. Such minority citizens are from environments in which the dom-

inant language is other than English. In addition they have been denied equal educational opportunities by State and local governments, resulting in severe disabilities and continuing illiteracy in the English language. The Congress further finds that, where State and local officials *conduct elections* only in English, language minority citizens are excluded from participating in the electoral process. In many areas of the country this exclusion is aggravated by acts of physical, economic, and political intimidation. The Congress declares that, in order to enforce the guarantees of the fourteenth and fifteenth amendments to the United States Constitution ... *it is necessary to eliminate such discrimination by prohibiting English-only elections, and by prescribing other remedial devices.*" 42 U.S.C. § 1973b(f)(1) (emphasis added). Thus the Voting Rights Act is aimed at the "conduct of elections," and not simply the limited act of voting on election day.

In support of their contention that the minority language provisions of the Voting Rights Act do not apply to the ballot initiative petition process, the defendants rely on a 1976 opinion of the Colorado attorney general in which it was concluded that petitions for initiatives are not "material" or "information relating to the electoral process provided by the state or political subdivision." (*See* Brief of Meyer and State, at 6–7.) The basis for the opinion was the observation that "one cannot vote against placing an initiative on the ballot through the signing process but only indicate assent to the measure being placed on the ballot, which is then bilingual where appropriate."

I find this observation, as it applies to this case, to be both offensively patronizing and wholly ignorant of the purpose behind the Voting Rights Act and its amendments. The observation suggests that no language minority voter would ever support an English only initiative, and, therefore, there is no reason why a petition supporting such an initiative should be printed in words that

language minority voters understand. Such reasoning runs counter to the purpose of the Act and its amendments, i.e., to fully include all minorities entitled to vote in the electoral process. Moreover, the weakness of such reasoning is demonstrated by the presence in the instant case of English Only Committee members with Hispanic surnames.[2]

Defendants assert that "it is fair to assume that the Justice Department would have spoken at some point during the past twelve years if they believed that the initiative process needed to be included in the bilingual constraints." (Brief of Meyer and State, at 7.) However, § 55.19(a) demonstrates that the Justice Department has not remained silent. As discussed, *supra,* that regulation expressly includes the term "petitions" in its listing of minority language materials. In the absence of clear Congressional intent, legislative history, or persuasive case law to the contrary, I afford considerable deference to the regulations of the administrative agency assigned to implement the statute.

In sum, I conclude that, as a matter of law, ballot petitions constitute "materials or information relating to the electoral process," within the meaning of 42 U.S.C. §§ 1973b(f)(4) and 1973aa–1a(c). This conclusion is strongly supported by 28 C.F.R. § 55.19(a)'s statement that the written materials covered by the Voting Rights Act include "petitions."

I further conclude that it is likely that the plaintiffs will prevail on the mixed factual/legal issue whether the actions of government officials in this case are sufficient to satisfy the "state action" requirements of the Voting Rights Act. Where state constitutional provisions and state statutes grant private parties the traditional government function of initiating proposed constitutional amendments, the activities of the private parties often have been held to constitute state action for purposes of the Voting Rights Act.

---

**2.** It is entirely conceivable that some registered electors of Colorado who are not themselves literate in English support the English Only movement out of a concern that too much reliance on non-English by their children will prevent them from obtaining an equal educational opportunity. These persons should not be excluded from the electoral process.

In the present action, the English Only defendants acted jointly with the defendants Meyer and the State of Colorado in establishing the form and even part of the content of the petition documents. As described above, the State of Colorado has established an elaborate pre-clearance procedure for ballot initiatives. Thus as observed by the plaintiffs, this is not a case in which private parties formulated the contents of a petition notice and published that opinion on their own, without input or approval by state or local government officials. To the contrary, the State of Colorado "acted" here by approving initiative petitions that failed to comply with the minority language provisions of the Voting Rights Act.[3] That the state has mandated by law that certain preliminary steps be taken by the proponents of an issue "does not in any sense absolve the governmental entity of its responsibility under the Voting Rights Act. Such compelled acts are far from removed from those voluntarily undertaken by a candidate, such as the printing of campaign literature." *Zaldivar, supra,* 780 F.2d at 833 n. 11.

Moreover, the ballot initiative was commenced by an elected state official, who had unsuccessfully proposed a similar measure in the Colorado General Assembly. Despite the good faith efforts of some members of the Colorado General Assembly's legislative drafting agencies to keep a distinct line between Representative Philips' dual roles as legislator and initiative proponent, evidence introduced at the hearing indicated that this line may have been crossed. For example, in proposing and promoting the ballot initiative the defendant Philips has used her state government office, official stationery, state telephone, and probably state secretarial services. Furthermore, 28 C.F.R. § 55.19(a)'s use of the term "petitions" in its listing of election materials indicates the Justice Department's view that the petition process is related to the electoral process, which clearly is a function of the state.

Accordingly, I conclude that the plaintiffs are likely to prevail on the merits on their claim that the initiative petitions violated the language minority provisions of the Voting Rights Act. Because of my determination that the plaintiffs will likely prevail on their first claim for relief, I need not address at this time the plaintiff's second claim for relief under § 1983 and the due process clause of the Fourteenth Amendment.

At the hearing, the defendants alternatively argued that even if the Voting Rights Act applies to the circulation of initiative petitions, the plaintiffs cannot prevail on the merits on their first claim for relief because they cannot prove which petitions were actually circulated in the 12 "bilingual counties." In arriving at their 61,000 plus figure for alleged defective signatures, the plaintiffs discounted all petitions that either: (1) contained the signature of a person who listed his or her address as being in one of the 12 "bilingual counties"; or (2) were circulated by a person who listed his or her address as being in one of the 12 "bilingual counties."

Defendants are correct in arguing that this method of discounting signatures does not necessarily reflect the number of signatures actually collected on petitions circulated in bilingual counties. However, Colorado law does not require that a ballot initiative petition indicate in which county or counties it was circulated. In *Gerena–Vanentin, supra,* it was considered inequitable to require the city to suffer because the plaintiffs had failed to comply with the Voting Rights Act. Similarly, here it would be unfair to penalize the plaintiffs for the State of Colorado's failure to require petitions to specify where they are circulated. The State's omission clearly renders more difficult to enforce the minority language provisions of the Voting Rights Act, and places an excessive burden on the plaintiffs.

---

**3.** Thus this case is distinguishable from the district court's decision in *Zaldivar, supra,* 590 F.Supp. 852, where private parties formulated the contents of a recall petition notice and published the notice on their own, without input or approval by state or local government officials.

If sufficient signatures remained to satisfy the requirement of Colorado law for certifying an initiative for the ballot after all signatures appearing on petitions circulated in any of the 12 "bilingual counties" had been stricken, then the failure to comply with the Voting Rights Act would not prohibit the ballot initiative from proceeding. However, the defendants should not be permitted to benefit from the State's failure to require petitions to indicate in which counties they were circulated. Therefore, for purposes of this lawsuit it shall be a rebuttable presumption that a petition was circulated in one of the 12 "bilingual counties" if: (1) the petition contains the signature of a person who listed his or her address as being in one of the 12 "bilingual counties"; or (2) the person who signed the petition as the circulator listed his or her address as being in one of the bilingual counties.

### B. *Irreparable Injury.*

█ Generally, plaintiffs may only be granted preliminary injunctive relief upon showing that they would suffer irreparable injury if an injunction were not granted. An injury is "irreparable" only if it cannot be undone through monetary remedies. *Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328, 228 (5th Cir. 1981).

Importantly, it appears that monetary damages are not recoverable under the Voting Rights Act. *Olagues v. Russoniello,* 770 F.2d 791 (9th Cir.1985). Thus if a preliminary injunction is not issued the plaintiffs will be forced to expend considerable time and money in opposing the initiative, and such expenditures would not be compensable under the Voting Rights Act even if a violation is found.

Moreover, in *Harris v. Graddick,* 593 F.Supp. 128, 135 (M.D.Ala.1984), the court stated that plaintiffs seeking injunctive relief pursuant to § 2 of the Voting Rights Act "are not required to make the usual showing of irreparable injury as a prerequisite to relief; rather, such injury is presumed by law." Section 2 prohibits any practice or procedure that results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color. 42 U.S.C. § 1973(a).

Nonetheless, it is unnecessary for me to determine whether the reasoning in *Harris* applies to the claims of the plaintiffs in this case because I conclude that the plaintiffs have demonstrated that they would suffer irreparable injury if the preliminary injunction is not issued.

By excluding minority language voters from the petition process, the defendants have denied such voters an opportunity to participate meaningfully in an important part of the electoral process. Testimony at the hearing alluded several times to the recent effort to recall Denver, Colorado's current mayor. The petition process itself stirred much debate in the community, and heavy media coverage that educated Denver voters regarding the issues involved in the attempted recall. Partly as a result of that debate, the recall proponents were unable to secure sufficient signatures to obtain a recall election. Clearly the petition process played a major role in the outcome of that recall effort.

In the instant action, to the extent that the plaintiffs, and those similarly situated, were denied access to the process and their rights to participate meaningfully in it, a post-election determination that the Voting Rights Act had been violated would be a hollow remedy. Moreover, the plaintiffs are faced with the burden of opposing a ballot initiative that may never have reached the ballot if the initiative petitions circulated in the 12 "bilingual counties" had been printed in both English and Spanish, thus giving earlier notice to opponents who might have campaigned to discourage voters from signing the petitions.

Whether they are correct or not, the evidence indicates that many minorities interpret the English Only initiative as a racist attempt to exclude minorities from mainstream society, and to eradicate cultural pluralism. At the hearing, the plaintiff Montero testified to the anxiety and animosity that now exist in Colorado's minori-

ty language communities as a result of the instant ballot initiative and the community divisiveness it has engendered even without an election campaign. The law provides no remedy for the anxiety and polarization which will occur if the campaign goes forward, and an ultimate legal victory after trial vindicating the plaintiffs', position could not reweave the fabric of community good will.

### C. *Relative Harm.*

Clearly the benefits to the plaintiffs of a preliminary injunction outweigh any harm that would result to the defendants. Defendants Meyer and the State of Colorado would only be harmed by the preliminary injunction in that they probably would be precluded from certifying the English Only initiative for the November 8, 1988 ballot.

With respect to the English Only defendants, an injunction would necessitate the collection of signatures on new, bilingual petitions in the counties affected by the minority language provisions of the Voting Rights Act, assuming that the English Only defendants wish to proceed with the initiative. While this would cause inconvenience and additional expense, such a result could have been avoided had those defendants obeyed the language minority provisions of the Voting Rights Act, and 28 C.F.R. § 55.19(a). Additionally, given my conclusion that the plaintiffs are likely to prevail on the merits of their first claim for relief, it is probable that the English Only defendants eventually would be forced to encounter the additional inconvenience and expenditures at some future point.

Morever, any inconvenience to the defendants and additional expenditures required by the English Only defendants are outweighed by the need to remedy the alleged denial to the plaintiffs and other registered Spanish speaking voters of full and equal participation in the electoral process.

### D. *Public Interest.*

Finally, I conclude that the public interest will be served by granting a preliminary injunction in this case. The public interest clearly supports enforcement of the bilingual provisions of the Voting Rights Act because these provisions are essential to the full participation of language-minority citizens in the electoral process, the goal sought by Congress in enacting this law.

### III.

For the reasons stated above, IT IS ORDERED that:

(1) Plaintiffs' motion for a preliminary injunction is granted; and

(2) Defendants State of Colorado, and Colorado Secretary of State Natalie Meyer, and her agents and successors in office, are enjoined from holding an election on the "English Only" initiative based on initiative petitions circulated in the following Colorado counties: Alamosa, Archuleta, Bent, Conejos, Costillo, El Paso, Huerfano, Las Animas, Otero, Pueblo, Rio Grande, and Saguache. Because the State of Colorado does not require an initiative petition to indicate the county or counties in which that petition was circulated, it shall be a rebuttable presumption that a petition was circulated in one of the above-stated counties if either: (1) that petition contains the signature of a person who listed his or her address as being in one of the above-stated counties; or (2) the person who signed that petition as the circulator listed his or her address as being in one of the above-stated counties.